ROYAL INDEMNITY COMPANY,
Plaintiff,

v.

WYCKOFF HEIGHTS HOSPITAL,
Defendant.

No. 93–CV–5544(JRB).

United States District Court,
E.D. New York.

Dec. 16, 1996.

---

John V. Fabiani, Jr., Brody & Fabiani, New York City, for plaintiff.

Lynn Hajek, Breitner & Hoffman, P.C., New York City, for defendant.

### MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

Plaintiff Royal Indemnity Company ("Royal") moves under Rules 12(f) and 56 of the Federal Rules of Civil Procedure for an order striking the defense of subject matter jurisdiction and granting summary judgment. Defendant Wyckoff Heights Hospital ("Wyckoff") cross-moves for summary judgment and, in the alternative, moves to remand the action to state court for lack of diversity jurisdiction. For the reasons set forth below, the motion to strike is granted, the motion to remand is denied, Royal's motion for summary judgment is granted, and Wyckoff's cross-motion for summary judgment is denied.

### Background

The Court discussed the background of this action in its Memorandum–Decision and Order dated September 11, 1995 ("September Decision"), which decided motions to amend and to dismiss for lack of capacity, and will not here repeat itself unnecessarily. The September Decision directed the parties to submit additional evidence as to Royal's principal place of business and reserved decision on the cross motions for summary judgment.

### Discussion

I. *Subject Matter Jurisdiction and Corporate Citizenship*

For the purpose of diversity jurisdiction, a corporation finds itself a citizen of "any state by which it has been incorporated and of the state where it has its principal place of business." 28 U.S.C. § 1332(c)(1); *see also, Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131, 141 (2d Cir.1991); *In re Joint E. and S. Dist. Asbestos Litig.*, No. 87–CV–0537, 1990 WL 129194, at * 2 (E. & S.D.N.Y. Aug. 30, 1990). As discussed in the September Decision, Wyckoff is incorporated in New York and has its principal place of business in New York, while Royal is incorporated in Delaware. As to citizenship, only the question of Royal's principal place of business remains. Royal contends that its principal place of business is in North Carolina, while Wyckoff contends that it is in New York.

In this circuit, the principal place of business of a corporation is determined by one of two multi-factored judicial tests: either the "nerve center test" for corporations with operations spread over numerous states or the "place of the activities/public impact test" for corporations with more localized operations. *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 654–55 (2d Cir. 1979); *In re Asbestos Litig.* at * 2–3; *Powers v. Fox Television Stations*, 907 F.Supp. 719, 721–22 (S.D.N.Y.1995); *Hungarian Broad. Corp. v. Coleman and Co. Sec.*, No. 96–CV–0048, 1996 WL 374173 at * 1–2, (S.D.N.Y. July 2, 1996).

It is undisputed that Royal is a major insurance company, conducting business in all fifty states and has offices throughout the nation. (Wheeler Aff. ¶¶ 6, 7.) As such, Royal is the paradigm of the "corporation with operations spread over numerous states," and the nerve center test applies. The nerve center test looks to "those factors that identify the place where overall corporate policy originates," *R.G. Barry Corp.*, 612 F.2d at 655, or the "nerve center from which it radiates out to its constituent parts and from which its officers direct, control and

coordinate all activities without regard to locale, in the furtherance of the corporate objectives." *Id.* (quoting *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y.1959)).

■ In response to the September Decision, Royal submits the affidavits of Joyce Wethington Wheeler, Vice President and Corporate Secretary of Royal, and Paul R. Cullinan, a claims consultant employed by Royal. In her affidavit, Ms. Wheeler states that Royal moved its headquarters from New York to North Carolina in 1986 and that all administrative functions have been performed in North Carolina since then. (Wheeler Aff. ¶ 2.) All of Royal's senior executives are located in North Carolina, and eight of Royal's nine directors are employed by Royal in North Carolina. (*Id.* at ¶¶ 2, 4.) The ninth director recently retired from the North Carolina headquarters, and continues to live in North Carolina, as do the other eight. (*Id.* at ¶ 4.) The board of directors meets in North Carolina. (*Id.* at ¶ 4.) Royal makes all of its underwriting, marketing and claims policy decisions in North Carolina, and handles all of its regulatory and actuarial functions in North Carolina. (*Id.* at ¶ 2.) Royal keeps its corporate books and records in North Carolina. (*Id.* at ¶ 2.) Finally, Royal performs all of its accounting functions in North Carolina and meets its regulatory obligations for all fifty states out of its North Carolina headquarters. (*Id.* at ¶¶ 4, 5.)

The Cullinan affidavit adds nothing to Ms. Wheeler's statements.

In opposition to the Wheeler and Cullinan affidavits, Wyckoff submits the affirmation of its attorney, David N. Hoffman. This affirmation submits no contrary information, but only serves to offer alternate interpretations of the information in Royal's affidavits. The only evidence offered in Hoffman's affirmation is a series of pages from the *1995 New York Lawyers Diary and Manual* which list several subsidiaries of the Royal Insurance Company of America, including Royal, and direct the reader's attention to the main entry for information. Hoffman's affirmation argues that this information indicates that Royal Group, and possibly not Royal itself, has its principal place of business in North Carolina. (Hoffman Affirm. ¶ 4.) Hoffman's affirmation goes on to state that Royal has "huge contact" with New York. (*Id.* at ¶ 5.) The remainder of the affirmation attacks the propriety of using Mr. Cullinan to establish the principal place of business of Royal, arguing that Mr. Cullinan did not know the same information during his deposition, and that at the deposition, his attorney argued that Mr. Cullinan "is not the witness to ask [sic] questions about the corporate status." (Hoffman Affirm. Ex. C at 14.) As noted above, the Cullinan affidavit adds nothing to the Wheeler affidavit, and even assuming *arguendo* that the Cullinan affidavit should not be considered by the Court, Wyckoff has submitted no evidence tending to show that Royal's principal place of business is anywhere other than North Carolina. The information supplied by Wyckoff merely indicates that Royal does business in New York, an issue of personal jurisdiction which is not in controversy. Wyckoff also offers the possibility that the information indicates that Royal does not have a corporate identity separate from that of Royal Insurance Company of America, a legal theory never suggested by either party and which, as noted in the September Decision's "alter ego" discussion also would seem to indicate Royal's principal place of business as North Carolina.

In short, the evidence unquestionably establishes that Royal's principal place of business is North Carolina. Thus diversity jurisdiction[1] is preserved, and Royal's motion to strike the defense of subject matter jurisdiction is granted and Wyckoff's motion to remand is denied.

## II. *The Insurance Policy*

■ The gravamen of this action is the interpretation of Commercial Umbrella Liability Policy No. EB 102395 (the "Policy") issued to Wyckoff by Royal and in effect at all times relevant to this action. The Policy provided Wyckoff with maximum coverage of

---

1. As the parties agree that $250,000 is at stake, the amount in controversy requirement of diversity jurisdiction is met. 28 U.S.C. § 1332(a).

$20 million in excess of Wyckoff's self-insured retention ("SIR") of $1 million per occurrence of professional liability. The parties agree that the Policy unambiguously required Wyckoff to satisfy the first $1 million of a malpractice judgment or settlement before Royal's obligation to provide excess insurance would be triggered.

As the result of a settlement during trial of a professional malpractice action in state court, Wyckoff paid $750,000 to purchase an annuity scheduled to make payments totaling $1 million over twelve years. Wyckoff maintained that this arrangement satisfied its SIR. Royal disagreed, but when Wyckoff refused to contribute additional money, Royal contributed $750,000 cash to the settlement in order not to upset the negotiated settlement and risk a larger jury award. Royal reserved its right to seek reimbursement from Wyckoff.

The parties limit their dispute to whether Wyckoff's purchase of the $1 million annuity at a cost of $750,000 satisfied its obligations under the Policy. Wyckoff urges that the Policy is ambiguous because it fails to specify the time and manner in which it must satisfy the SIR. Royal contends that the Policy requires Wyckoff to spend at least $1 million in present value dollars in order to trigger Royal's obligation to provide excess coverage.

### A. *Wyckoff's Argument that the Policy is Ambiguous*

When interpreting an insurance policy, the Court must first look to the plain meaning of the policy. *Francis v. INA Life Ins. Co. of N.Y.*, 809 F.2d 183, 185 (2d Cir.1987); *In re Ambassador Group, Inc. Litig.*, 738 F.Supp. 57, 62–63 (E.D.N.Y.1990); *Maurice Goldman & Sons, Inc. v. Hanover Ins. Co.*, 80 N.Y.2d 986, 987, 592 N.Y.S.2d 645, 646, 607 N.E.2d 792, 793 (1992). The policy includes the following provisions:

#### Coverage

The Company agrees to pay on behalf of the **Insured** the **Ultimate Net Loss,** in excess of the applicable **Underlying** or **Retained Limit,** which the **Insured** shall become legally obligated to pay because of:

(a) **Personal Injury**

(b) **Property Damage**

(c) **Advertising Liability**

caused by an **Occurrence** which takes place during the policy period anywhere in the world.

#### Limit of Liability

A. With respect to coverages 1(a), 1(b), or 1(c), the Company's liability shall be only for the **Ultimate Net Loss,** resulting from any one **Occurrence** in excess of either:

(1) the amount recoverable under underlying insurance as stated in the Declarations and the amount recoverable under any other underlying insurance collectible by the **Insured,** or

(2) the **Retained Limit** as stated in the Declarations.

#### Underlying Limit—Retained Limit

The Company shall be liable only for the **Ultimate Net Loss** in excess of the greater of the **Insured's:**

A. UNDERLYING LIMIT—An amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule of Underlying Insurance, plus the applicable limits of any other underlying insurance collectible by the **Insured;** or

B. RETAINED LIMIT—The amount specified in Item 3 of the Declarations as a result of any one **Occurrence** not covered by underlying insurance, and which shall be borne by the **Insured.**

"Ultimate Net Loss" means: the total sums actually paid or payable as damages in settlement of a claim with the written consent of the Company or in satisfaction of a judgement for which the **Insured** is legally liable ...

(Wyckoff's Cross–Mot. for Summ. J.Ex. A at 2–4.)

These provisions, taken together, present a very simple situation when examined in the light of the underlying malpractice action, much of which is not here in controversy:

Royal must pay the "Ultimate Net Loss" of any settlement remaining after Wyckoff pays its SIR of $1 million.

█ In order to argue whether Wyckoff's purchase of the $750,000 annuity met its SIR obligations, the parties rely most heavily on their competing interpretations of "Ultimate Net Loss" as defined in Section IV of the Policy. Wyckoff urges that the use of the words "paid or payable" in the above definition means that any method of payment of a claim, now or in the future, so long as the cumulative payments total $1 million, will satisfy its obligations. This position is untenable. If Wyckoff's interpretation were adopted, by its logic, it could satisfy its SIR at any time in the future, so long as cash payments totaled $1 million.

The annuity purchased by Wyckoff for $750,000 makes twelve annual payments of $83,334. Assuming that interest is compounded annually, this annuity gives a 4.7297% rate of return. Following Wyckoff's logic, an annuity purchased for $476,047 with the same rate of return, making thirty-six annual payments of $27,778 would satisfy its SIR obligations. Likewise, an annuity purchased for only $330,365 with the same rate of return, making sixty annual payments of $16,667 would satisfy its SIR obligations. This is not a reasonable reading of the Policy as a whole, the spirit of which was to have Wyckoff spend the first $1 million of any judgment or settlement. Wyckoff clearly has spent only $750,000.

Wyckoff counters this intuitive reading with the non-responsive argument that Eric Ploen, president and CEO of a risk management consulting service, testified at his deposition that the term "cash" was absent from the policy and that in his opinion, Wyckoff could satisfy its SIR with goods and services. (Wyckoff's Cross–Mot. for Summ.J.Ex. G at 18.) While this issue is not before the Court, even assuming *arguendo* that Wyckoff could satisfy its $1 million SIR with an "in kind" payment, it could not do so with goods and services worth only $750,000, *even if* those goods and services might cost $1 million twelve years in the future. Wyckoff has not found an ambiguity in the policy, but merely an unreasonable interpretation.

Wyckoff next urges that the judge in the underlying state court malpractice action felt that Wyckoff's scheme satisfied its SIR, implying that this Court is bound by the state judge's alleged remarks. To support this claim, Wyckoff submits Mr. Cullinan's handwritten notes which read, "The judge & II atty are friends. The judge has said that $1m Pd. over 18 yrs meets payment of underlying requirements." (Breitner Reply Decl.Ex.B.) The record in this case does not reflect any remarks even remotely resembling this. The only remarks by the state court judge in the record on this subject are:

For the purposes of this settlement, Wyckoff Heights Hospital and Royal Insurance have each done what they did, knowing fully what the consequences are, and each of them have reserved the right, if they choose, to assert the rightfulness of their respective claims, and that is not being waived by the payments being agreed to here, nor is it being asserted that they will—such claims will be immediately pursued.

. . . .

Gentlemen, it is not necessary to argue the merits of respective claims, as to whether the obligation of Wyckoff to pay the initial $1 million has or has not been satisfied.

We need not determine that at this time.

(Royal's Mot. for Summ.J.Ex. L at 828–29.)

The record does not indicate that the judge ever said what Mr. Cullinan's notes reflect, but only that an attorney present at trial said this to Mr. Cullinan. (Wyckoff's Cross–Mot. for Summ.J.Ex. C at 134–35; Wyckoff's Mem. of Law in Supp. of its Cross–Mot. for Summ.J. and in Opp'n to Royal's Mem. at 16.) The transcript holds no indication that these words ever passed the state judge's lips, leaving only the possibility that the notes reflect either Mr. Cullinan's thoughts, suppositions, beliefs or fears or Mr. Cullinan's impression and recollection of another attorney's thoughts, suppositions, beliefs or fears. In either instance, the notes are immaterial.

In another attempt to have the Court strain to find an ambiguity where none ex-

ists, Wyckoff urges that the "reasonable expectations doctrine" of New York dictates that the policy be found to be ambiguous. As noted in *In re Ambassador Group, Inc. Litigation,* 738 F.Supp. 57 (E.D.N.Y.1990):

> [I]n New York, courts are not to view the contract from the point of view of an easily befuddled or misled consumer. Rather, "it is well-established that '[t]he plain meaning of the policy language is not measured ... by the understanding of a layperson, but by the understanding of a person engaged in the insured's course of business.' "

*Id.* at 62–63 (quoting *Moshiko, Inc. v. Seiger & Smith, Inc.,* 137 A.D.2d 170, 176, 529 N.Y.S.2d 284, 288 (N.Y.App.Div.), *aff'd,* 72 N.Y.2d 945, 533 N.Y.S.2d 52, 529 N.E.2d 420 (1988)). As in *Ambassador,* the insured here is a "sophisticated business" entity in the market for this type of insurance. To be sure, Wyckoff is a multimillion dollar hospital with professional risk management and outside counsel. Perhaps no better source for determining the "understanding of a person engaged in the insured's course of business" in this case is to take notice of the widely-used *Handbook On Insurance Coverage Disputes,* which states that in excess liability situations, "[a] covered loss must exceed the amount of the SIR before an excess or umbrella policy will respond to the loss." Barry R. Ostrager and Thomas R. Newman, *Handbook On Insurance Coverage Disputes* § 13.13 at 628 (8th ed. 1995) (citing *Zurich Ins. Co. v. Protective Ins. Co.,* No. 86–CV–73459–DT (E.D.Mich. July 13, 1987)). The clear implication is that the insured must suffer a "loss" which exceeds the SIR. It cannot be said with any sincerity that Wyckoff's "loss" exceeded the $750,000 which it paid for the annuity.

Finally, the parties rely on definitions of "payable" from a series of popular dictionaries, but neglect the definition found in the time-honored *Black's Law Dictionary:*

> Capable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable. A sum of money is said to be payable when a person is under an obligation to pay it. Payable *may* therefore signify an obligation to pay at a future time, *but, when used without qualification, term normally means that the debt is payable at once, as opposed to "owing."*

*Black's Law Dictionary* 1128 (6th ed. 1990) (emphasis added). Although "payable" might mean a future obligation in some circumstances, as is used in the Policy, the only reasonable understanding is that it adds to the meaning of "paid" by including a sum which is enforceably due or obligated, but not yet actually remitted.

In short, a future payment with a present value of less than the SIR cannot here be used to satisfy Wyckoff's contractual obligation.

### B. *Wyckoff's Argument that Royal was a "Volunteer"*

■ Wyckoff claims that even if it was required to meet its SIR in present value dollars, Royal "voluntarily" contributed $250,000 toward the settlement and Wyckoff's SIR. That argument is without merit. Wyckoff offers two twenty-year-old cases from other jurisdictions to support its position, and neither does.

In the first case, the excess insurer settled a case after the primary insurer unjustifiably breached its policy and refused to defend its insured. *Aetna Cas. and Sur. Co. v. Coronet Ins. Co.,* 44 Ill.App.3d 744, 3 Ill.Dec. 371, 375, 358 N.E.2d 914, 918 (1976). Although the court awarded the excess insurer reimbursement to the extent of the primary coverage, *id.,* it did not grant the excess insurer the windfall of having the primary insurer pick up the excess insurer's coverage as well. *Id.* at 376, 358 N.E.2d at 919. This case might apply if Royal was seeking reimbursement of $750,000 instead of $250,000.

In the second case, the court held that a primary insurer has no duty either to discover the existence of an excess insurer or to notify it of a pending action against their mutual insured. *Western World Ins. Co. v. Allstate Ins. Co.,* 140 N.J.Super. 338, 356 A.2d 83, 86 (Law Div.1976). The court further held that an insurance broker has no duty to notify a primary insurer of the existence of the excess insurer. *Id.* Wyckoff

fails to note that on appeal, the first part of the holding was reversed. *Western World Ins. Co. v. Allstate Ins. Co.*, 150 N.J.Super. 481, 376 A.2d 177, 180 (App.Div.1977). But for the fact that both the instant action and *Western World Insurance* deal with the relationship between primary and excess insurers—even if not later reversed—the case is entirely inapposite.

 Royal is correct when it points out that it cannot be called a volunteer for paying,

> a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made [by Royal] either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability.

*Medical Malpractice Ins. Ass'n v. Medical Liab. Mut. Ins. Co.*, 86 A.D.2d 476, 479–480, 450 N.Y.S.2d 191, 194 (N.Y.App.Div.), *appeal dismissed*, 57 N.Y.2d 604, 440 N.E.2d 800, 454 N.Y.S.2d 1029 (1982); *Gerseta Corp. v. Equitable Trust Co*, 241 N.Y. 418, 425–26, 150 N.E. 501, 504 (N.Y.1926). As discussed above, Wyckoff is "primarily answerable" for the full $1 million of the SIR and should have discharged it. Royal had a legitimate interest for making the payment, as settlement of the state court action was valued at $3 million and a jury could have reasonably returned liability up to $8 million, thereby exposing Royal to significant liability under the Policy. (Royal's Mot. for Summ.J.Ex. I at 5; Royal's Mot. for Summ.J.Ex. J at 2; Wyckoff's Cross–Mot. for Summ.J.Ex. E at 4.) Thus, Royal is not a volunteer and is not precluded from reimbursement.

C. *Wyckoff's Argument that Royal has "Unclean Hands"*

 Finally, Wyckoff argues that recovery for Royal should be barred by the doctrine of "unclean hands" in that Royal has "utilized [sic] structured settlements to satisfy its underlying primary coverage where the cost of the structured settlement was less than the underlying primary policy limits." (Wyckoff's Mem. of Law in Supp. of its Cross–Mot. for Summ.J. and in Opp'n to Royal's Mem. at 23.) This argument is a red herring. The issue here is not whether actions can be settled through structured settlements or the purchase of annuities, but whether excess coverage is triggered before the SIR is reached. Whether or not Royal purchases annuities to satisfy settlements against its insureds when it is the primary insurer is immaterial[2].

*Conclusion*

For the reasons set forth above, the motion to strike hereby is GRANTED and the motion to remand is DENIED. As the Policy is not ambiguous, summary judgment in favor of Royal is GRANTED and Wyckoff's cross-motion for summary judgment is DENIED. Judgment in the amount of $250,000 in favor of Royal is GRANTED.

**SO ORDERED.**

---

**2.** Although Royal disputes the allegation that it engaged in this practice, (Royal's Mem. of Law in Further Supp. of its Mot. for Summ.J. and in Opp'n to Wyckoff's Cross–Mot. for Summ.J. at 11–12,) the dispute is immaterial, and the Court assumes *arguendo* that it was Royal, and not an affiliate or subsidiary which purchases annuities in structured settlements.